TLF 10/02/2023
NEDT: USAO#2023R00613

JSDC- BALTIMORE
'23 OCT 3 PM 2:43

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>**v.**<br><br>**FREDERICK DOUGLASS**<br>**MOOREFIELD, JR.**<br>    **a/k/a "GEEHAD KENNELS" and**<br>**MARIO DAMON FLYTHE**<br>    **a/k/a "RAZOR SHARP**<br>    **KENNELS",**<br><br>        **Defendants.** | **CRIMINAL NO.** ___RDB-23-0354___<br><br>**(Conspiracy to Engage in an Animal Fighting Venture, 18 U.S.C. § 371; Buying, Selling, Delivering, Possessing, Training, or Transporting Animals for Participation in an Animal Fighting Venture, 7 U.S.C. § 2156(b) and 18 U.S.C. § 49(a); Use of Postal Service or Other Interstate Instrumentality for Promoting or Furthering an Animal Fighting Venture, 7 U.S.C. § 2156(c) and 18 U.S.C. § 49(a); Interstate and Foreign Travel or Transportation in Aid of Racketeering Enterprises, 18 U.S.C. § 1952(a)(3); Forfeiture, 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c))** |

## INDICTMENT

### COUNT ONE
### (Conspiracy to Engage in an Animal Fighting Venture)

The Grand Jury for the District of Maryland charges that:

### INTRODUCTION

At all times relevant to this Indictment:

A. <u>The Defendants</u>

1.     Defendants FREDERICK DOUGLASS MOOREFIELD JR., a/k/a "GEEHAD KENNELS" ("MOOREFIELD"), and MARIO DAMON FLYTHE, a/k/a "RAZOR SHARP KENNELS" ("FLYTHE") were Maryland residents.

B. <u>Animal Fighting Ventures and Dogfighting</u>

2.      The Animal Welfare Act defines an "animal fighting venture" as "any event, in or affecting interstate or foreign commerce, that involves a fight conducted or to be conducted between at least two animals for purposes of sport, wagering, or entertainment."  Under the Animal Welfare Act, it is illegal to sponsor or exhibit an animal in an animal fighting venture.  It is illegal to possess, train, sell, buy, transport, deliver, or receive an animal for purposes of having the animal participate in an animal fighting venture.  It is also illegal to use the Postal Service or any other interstate instrumentality—such as the internet or phone-based messaging applications—to promote or further an animal fighting venture.

3.      In the United States, dogfighting ventures usually involve "pit bull-type" dogs, which are preferred by dogfighters due to the breed's muscular build, short coat, and the aggression that some display toward other dogs.  Generally, a dogfight occurs when two dogs are released by their handlers in a controlled environment—often referred to as a "box" or "pit"—to attack each other and fight.  The fight ends when a dog "quits" by refusing to meet another dog in the center of the box, when a handler "picks up" their dog and forfeits the match, or when one or both dogs die.  A single fight can last for as long as three hours.

4.      Dogfighters generally sponsor their dogs in a fight with the goal of obtaining a "Champion" or "Grand Champion" status for their dogs, which is achieved by a dog winning three or five fights, respectively.

5.      Because of their conditioning and training, dogs used in animal fighting ventures are almost always housed separately from other dogs—in pens, cages, or on chains—so that they will not hurt or kill other dogs when the handler is absent.  Heavy chains or weighted collars are often used when restraining fighting dogs to develop neck strength.

6.      Generally, dogfighters select the strongest, most capable fighting dogs and selectively breed, sell, and fight only those dogs that display particular traits, including: (1) a dog's aggressiveness or propensity to fight other dogs, often referred to by dogfighters as "gameness"; (2) a willingness to continue fighting another dog despite traumatic and/or mortal injury; and (3) cardiovascular endurance to continue fighting for long periods of time and through fatigue and injury. Dogs displaying those attributes are often bred with other dogs displaying similar traits to enhance the bloodline of these dogs for dogfighting purposes. Dogfighters generally keep such dogs solely for dogfighting purposes. In order to breed these dogs, dogfighters often use an apparatus to which a female dog will be strapped in order to involuntarily inseminate the dog. Dogfighters refer to this apparatus as a "rape rack."

7.      Once a dogfighter locates an opponent and agrees upon terms for a fight, a match is set up or "hooked." When hooking a fight, the two dogfighters will try to match dogs of the same weight and sex. This practice is known as "calling out a weight." When calling out a weight, dogfighters will also agree on the amount to be wagered on the fight, as well as a separate "forfeit" amount to be paid out if a dogfighter backs out of a fight after it has been hooked. Even if a fight does not have live spectators, others can place wagers on the outcome of the fight. Those wagers are arranged and enforced through the internet—including through messaging applications such as Telegram—and the amounts owed can be paid in cash or using a digital payment platform such as CashApp. If a wager or forfeit is paid through CashApp, the bettor will often describe the transaction as being for something other than dogfighting.

8.      Fights are often hooked six to eight weeks in advance. During that time, the dogfighters put their dogs through a conditioning process referred to as a "keep." A keep involves a physical training program, including the use of treadmills for running and exercising the dog

away from public view; weight pulls used to increase the dog's strength and stamina; and devices such as "spring poles" and "flirt poles" to build jaw strength and increase aggression. A keep's training regimen can take place at a dogfighter's "yard" or indoors, away from public view. Generally, a keep also involves a nutritional plan for the dog, including the administration of drugs, vitamins, and other medicine, such as veterinary-grade steroids used to build muscle mass and aggression. Dogs matched for future fights are expected to achieve their established target weight by the scheduled match, similar to human boxing matches, which requires close attention to all aspects of the dog's keep routine.

9.      Before being sponsored in a fight, dogs may also be "rolled" to determine their gameness. A "roll" is functionally identical to an organized dogfight except that it is shorter in duration; the handlers are usually expected to separate the dogs after no more than ten or fifteen minutes. Dogs can be injured during a roll just as they would be injured during the course of an organized dogfight.

10.     Dogs who have been used in dogfighting may display injuries from fights, such as scars, puncture wounds, swollen faces, or mangled ears. Scars from organized dogfights are commonly found on the face and front legs, as well as on hind ends and thighs. Dogfighters commonly obtain veterinary medicines and medical devices to treat their dogs' injuries without risking scrutiny that might come from bringing the injured dog to a veterinarian.

11.     Dogs that lose fights or fail to show gameness are often killed. It is not uncommon for dogs that lose matches to be killed in cruel, torturous, and inhumane ways as a form of punishment.

C.  The "DMV Board" or "The Board," "Geehad Kennels," and "Razor Sharp Kennels"

12.     It can be challenging for dogfighters to find an opponent with a dog of the same weight and sex who is looking to sponsor that dog in a fight at the same time of year, and for a wager that is mutually agreeable to both parties.  For that reason, dogfighters rely heavily on each other, and extensive networks of contacts, to "call out a weight" and find a match.  Dogfighters often call out a weight to other known dogfighters in several states to increase their odds of finding a match.  This is often done over the internet.

13.     To maintain contact with each other to discuss dogfighting, to exchange photos and videos about dogfighting, dogfighters in the area of the District of Columbia, Maryland, and Virginia created private groups on the Telegram messaging application that they generally referred to as "The DMV Board" or "The Board."  Those groups had as many as 28 members at one time, which included several now-convicted dogfighters.

14.     In a message sent to one of the DMV Board groups on or around June 28, 2020, convicted dogfighter Derek Garcia posted the results of dogfights, including a fight between kennels named "G-Code" and "Geehad."  Defendant MOOREFIELD's phone number is identified in the contact list of several DMV Board members, and he is identified in those contact lists under various names, including "Geehad Fred."  During a search of Defendant MOOREFIELD's residence conducted on or about September 6, 2023, agents from the Federal Bureau of Investigation ("FBI") found and seized a weighted vest sized to fit a dog's body with a patch reading "Geehad Kennels."  During that search, Defendant MOOREFIELD also admitted to agents that he uses the alias "Geehad Kennels" to identify himself.

15.     On or about April 27, 2023, FBI agents showed a photo of Defendant MOOREFIELD to a convicted dogfighter who has signed a cooperation agreement in the Western

District of Virginia (referenced herein as "CW1"). CW1 identified the person in the photo as "Fred" and "Geehad" and stated "Fred" was last at his residence in 2021 to "roll" some dogs. CW1 also stated that "Fred" was affiliated with "Razor Sharp Kennels." CW4 identified "Razor Sharp Kennels" as "Mario Dogs" in his contacts list. The contact information for "Mario Dogs" matched Defendant FLYTHE's phone number and home address. During a search of his residence conducted on or about September 6, 2023, Defendant FLYTHE admitted to FBI agents that he uses the alias "Razor Sharp Kennels" to identify himself.

## MANNER AND MEANS OF THE CONSPIRACY

Among the manner and means by which the Defendants and others conducted and participated in the conspiracy were the following:

16.     Members of the conspiracy trained and used pit bull-type dogs for dogfights.

17.     Members of the conspiracy kept at their properties and trained fighting dogs owned by themselves as well as by other conspirators.

18.     Members of the conspiracy traveled to dog fights held at locations owned and/or arranged by themselves and other conspirators.

19.     Members of the conspiracy exchanged information about wagers and placed wagers on dogfights in which were entered dogs bred, trained, or owned by themselves and by other conspirators.

20.     Members of the conspiracy used cell phones and direct messages to discuss dogfights, dogfighting, breeding fighting dogs, training techniques to maximize their chances of developing champion fighting dogs, and methods to avoid being caught by law enforcement.

21.     Members of the conspiracy further used the encrypted messaging applications Telegram and WhatsApp to discuss training fighting dogs, buy and sell veterinary supplies for use

on fighting dogs, exchange videos about dogfighting, arrange and coordinate dogfights, and exchange information about wagers on dogfights, away from the view of law enforcement authorities.

22.     Members of the conspiracy used the names of their dogfighting operations and/or kennels to refer to themselves as well as to their dogfighting operations and/or kennels.

23.     Members of the conspiracy used the Telegram and WhatsApp messaging applications to circulate media reports about dogfighters who had been caught by law enforcement and to discuss methods to minimize the likelihood that they would be caught themselves.

## OVERT ACTS IN FURTHERANCE OF THE CONSPIRACY

In furtherance of the conspiracy, and to accomplish the objects of the conspiracy, the Defendants and their conspirators committed overt acts, including but not limited to the following:

24.     In or around November 2018, Anne Arundel County Animal Control responded to a report of two dead dogs in a plastic dog food bag in Annapolis, Maryland.  In the bag with the dogs, investigators found mail addressed to Defendant MOOREFIELD at his residence in Arnold, Maryland.  The dogs bore wounds and scarring patterns that were consistent with dogfighting, and a necropsy determined that the distribution and number of recent and healed dog bite wounds and scars present on both dogs was consistent with organized dogfighting.

25.     In a WhatsApp message exchange in or around February 2019, Defendant MOOREFIELD sent a dogfighting associate known as "Big Goon" a message attempting to "hook" a 39-pound female dog in a fight for a $3,000 wager.

26.     In a WhatsApp message exchange in or around March 2020, Defendant MOOREFIELD sent "Big Goon" a message linking a news article regarding a Columbia, South Carolina man who was convicted on federal dogfighting charges.

27.     In a WhatsApp message exchange in or around April 2022, Defendant MOOREFIELD sent a dogfighting associate known as "Rio" messages indicating that Defendant MOOREFIELD was scheduled to "ref" (referee) a dogfight in Baltimore.

28.     In a WhatsApp message exchange in or around May 2022 between Defendant MOOREFIELD and "Rio," Defendant MOOREFIELD described a dogfighter known as "Bushboy" as his "partner" in sponsoring a 43-pound male dog in a dogfight against one of "Rio's" dogs.

29.     In a Telegram message exchange in or around May 2022 between Defendant MOOREFIELD, "E Z," and "HardWay," Defendant MOOREFIELD and HardWay "hooked" a fight between 42-pound female dogs for a $4,000 wager with a $1,000 forfeit.  The fight was scheduled to take place in New Jersey eight weeks from that exchange.

30.     In a WhatsApp message exchange in or around June 2022, Defendant MOOREFIELD sent messages to a family member indicating that Defendant FLYTHE was sponsoring a 35-pound female dog in a fight in Philadelphia the following month.

31.     In a WhatsApp message exchange in or around March 2023, Defendant MOOREFIELD sent a message to an associate in which he encouraged the associate to use Telegram instead of WhatsApp for messaging due to Telegram's encryption.

32.     In or around March 2023, Defendant MOOREFIELD filmed videos showing what appeared to be fighting dogs training on treadmills in his home.

33.     In a text message exchange in or around March 2023, Defendant MOOREFIELD sent Defendant FLYTHE two pictures of a dog wearing a weighted collar on a leash.  Defendant MOOREFIELD later sent messages indicating that this dog won a fight that lasted one hour and

18 minutes by killing the other dog in the fight. Defendant FLYTHE replied "We're up next my G."

34.     In a WhatsApp message exchange in or around April 2023, Defendant MOOREFIELD sent a dogfighting associate (referenced herein as "CW2") a video showing two dogs on separate treadmills that was filmed in the unfinished portion of the lower level of Defendant MOOREFIELD's home. Defendant MOOREFIELD sent messages accompanying the videos that indicated that one of the dogs was "hooked" in a fight against a DMV Board member known as "425 Kennels."

35.     In a WhatsApp message exchange in or around April 2023, Defendant MOOREFIELD told Defendant FLYTHE that a May 20, 2023 fight was "back on" for a 36.5-pound dog for a wager of $1,500 with a $500 forfeit.

36.     In another WhatsApp message exchange in or around April 2023, Defendant MOOREFIELD told CW2 that he had "locked back in" a fight for one of his 36.5-pound male dogs on May 20, 2023 for a wager of $1,500 with a $500 forfeit.

37.     On or around May 20, 2023, as shown by Defendant MOOREFIELD's EZ Pass toll records, Defendants MOOREFIELD and FLYTHE drove to a dogfight in Defendant MOOREFIELD's vehicle.

38.     In a Telegram message exchange in or around September 2023 with "Big Goon," Defendant MOOREFIELD arranged to wager $700 on a dogfight he was not able to attend in-person. After "Big Goon" showed a video of the dog Defendant MOOREFIELD bet on "quitting" after 50 minutes, Defendant MOOREFIELD indicated that going forward he would not be "betting on nobodies dogs but mine."

39.     On or around September 6, 2023, Defendant MOOREFIELD was in possession of five pit bull-type dogs that were found in thick-barred metal cages in the unfinished portion of the lower level of Defendant MOOREFIELD's home.

40.     On or around September 6, 2023, Defendant MOOREFIELD was in possession of the following items consistent with engaging in dogfighting:

     a.  veterinary medicine (including Winstrol, an anabolic steroid) and veterinary tools (including syringes and a medical staple gun);

     b.  a rolled-up grey carpet with dark stains, which appears consistent with blood stains derived from multiple dogfights;

     c.  items used to train fighting dogs, including weighted collars, heavy chains, and a weighted vest bearing the name "Geehad Kennels";

     d.  a "keep" training schedule;

     e.  a "rape rack"; and

     f.  a device consisting of jumper cables attached to an electrical plug, which appears to have been used to electrocute dogs after losing fights.

41.     On or around September 6, 2023, Defendant FLYTHE was in possession of seven pit bull-type dogs found in the back yard and lower level of Defendant FLYTHE's home.

42.     On or around September 6, 2023, Defendant FLYTHE was in possession of the following items consistent with engaging in dogfighting:

     a.  a treadmill;

     b.  a "carpet mill" (a treadmill using carpeted flooring in place of a traditional belt);

     c.  other items used for training fighting dogs, including weighted collars;

     d.  paperwork regarding dog lineage;

e.  dog pedigrees; and

f.  a "Canine Athletes" business card.

## THE CHARGES

43.   From in or around November 2018 and continuing until in or around September 2023, in the District of Maryland and elsewhere, the Defendants,

**FREDERICK DOUGLASS MOOREFIELD, JR. a/k/a "GEEHAD KENNELS" and
MARIO DAMON FLYTHE a/k/a "RAZOR SHARP KENNELS",**

did knowingly and unlawfully conspire with one another and with co-conspirators "Big Goon," "Bushboy," "425 Kennels," and others, known and unknown to the Grand Jury, including individuals known as "Rio," "E Z," and "HardWay," to commit the following offenses:

a.  To sponsor and exhibit dogs in animal fighting ventures, in violation of Title 7, United States Code, Section 2156(a) and Title 18, United States Code, Section 49(a);

b.  To sell, buy, possess, train, transport, deliver, and receive dogs for purposes of having the dogs participate in animal fighting ventures, in violation of Title 7, United States Code, Section 2156(b) and Title 18, United States Code, Section 49(a);

c.  To use instrumentalities of interstate commerce for commercial speech for the purposes of advertising animals for use in animal fighting ventures, promoting, and in other manners furthering animal fighting ventures, in violation of Title 7, United States Code, Section 2156(c) and Title 18, United States Code, Section 49(a); and

d.  To use a facility in interstate commerce, namely the internet, Telegram, and other text- and instant-messaging applications, with the intent to promote, manage, establish, carry on and facilitate the promotion, management, establishment and carrying on of an unlawful activity, that is, a business enterprise involving gambling in violation of the laws of

Maryland and of the United States, in violation of Title 18, United States Code, Section 1952(a)(3).

18 U.S.C. § 371

## COUNTS TWO THROUGH SIX
### (Buying, Selling, Delivering, Possessing, Training, or Transporting Animals for Participation in an Animal Fighting Venture)

The Grand Jury for the District of Maryland further charges that:

1.      The allegations set forth in Paragraphs 1 through 42 of Count One of this Indictment are incorporated here.

2.      On or about the following dates, in the District of Maryland and elsewhere, the Defendants,

**FREDERICK DOUGLASS MOOREFIELD, JR. a/k/a "GEEHAD KENNELS" and MARIO DAMON FLYTHE a/k/a "RAZOR SHARP KENNELS",**

did knowingly and unlawfully possess, train, transport, deliver, and receive dogs for purposes of having the dogs participate in an animal fighting venture, as referenced in the Overt Acts listed below:

| Count | Defendant(s) | Date | Overt Act(s) |
|---|---|---|---|
| 2 | FLYTHE | June 2022 | 30 |
| 3 | MOOREFIELD | March 2023 | 32 |
| 4 | MOOREFIELD and FLYTHE | March 2023-May 2023 | 33-37 |
| 5 | MOOREFIELD | September 2023 | 39-40 |
| 6 | FLYTHE | September 2023 | 41-42 |

7 U.S.C. § 2156(b)
18 U.S.C. § 49(a)

## COUNT SEVEN
### (Use of Postal Service or Other Interstate Instrumentality for Promoting or Furthering an Animal Fighting Venture)

The Grand Jury for the District of Maryland further charges that:

1.    The allegations set forth in Paragraphs 1 through 42 of Count One of this Indictment are incorporated here.

2.    From in or around March 2023 and continuing through in or around May 2023, in the District of Maryland and elsewhere, the Defendants,

**FREDERICK DOUGLASS MOOREFIELD, JR. a/k/a "GEEHAD KENNELS" and
MARIO DAMON FLYTHE a/k/a "RAZOR SHARP KENNELS",**

did knowingly and unlawfully use an instrumentality of interstate commerce for commercial speech, namely the internet, Telegram, WhatsApp, and other text- and instant-messaging applications, for the purposes of advertising an animal fighting venture, and promoting and in any other manner furthering an animal fighting venture, as referenced in the Overt Acts described in Paragraphs 33 through 37 of Count One of this Indictment.

7 U.S.C. § 2156(c)
18 U.S.C. § 49(a)

14

## COUNTS EIGHT THROUGH TEN
**(Interstate and Foreign Travel or Transportation in Aid of Racketeering Enterprises)**

The Grand Jury for the District of Maryland further charges that:

1.     The allegations set forth in Paragraphs 1 through 42 of Count One of this Indictment are incorporated here.

2.     On or about the following dates, in the District of Maryland and elsewhere, the Defendants,

**FREDERICK DOUGLASS MOOREFIELD, JR. a/k/a "GEEHAD KENNELS" and MARIO DAMON FLYTHE a/k/a "RAZOR SHARP KENNELS",**

used a facility in interstate commerce, namely the internet, Telegram, WhatsApp, and other text- and instant-messaging applications, with the intent to promote, manage, establish, carry on and facilitate the promotion, management, establishment and carrying on of an unlawful activity, that is, a business enterprise involving gambling in violation of 7 U.S.C. § 2156 and Md. Code Crim. Law § 12-102(a)(3), and thereafter performed and attempted to perform acts to promote, manage, establish and carry on, and to facilitate the promotion, management, establishment and carrying on of such unlawful activity, as referenced in the Overt Acts listed below:

| Count | Defendant(s) | Date | Overt Act(s) |
|---|---|---|---|
| 8 | MOOREFIELD | February 2019 | 25 |
| 9 | MOOREFIELD and FLYTHE | March 2023-May 2023 | 33-37 |
| 10 | MOOREFIELD | September 2023 | 38 |

18 U.S.C. § 1952(a)(3)

## FORFEITURE ALLEGATION

The Grand Jury for the District of Maryland further finds that:

1. Pursuant to Rule 32.2, Fed. R. Crim. P., notice is hereby given to the defendant that the United States will seek forfeiture as part of any sentence in accordance with 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), in the event of the Defendants' convictions under Counts Eight through Ten of this Indictment.

### Travel Act Forfeiture

2. Upon conviction of any of the offenses alleged in Counts Eight through Ten of this Indictment, the Defendants,

**FREDERICK DOUGLASS MOOREFIELD, JR. a/k/a "GEEHAD KENNELS" and
MARIO DAMON FLYTHE a/k/a "RAZOR SHARP KENNELS",**

shall forfeit to the United States, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to such offense(s).

### Substitute Assets

3. If, as a result of any act or omission of the defendant, any of the property described above as being subject to forfeiture):

    a. cannot be located upon the exercise of due diligence;

    b. has been transferred or sold to, or deposited with, a third person;

    c. has been placed beyond the jurisdiction of the Court;

    d. has been substantially diminished in value; or

    e. has been commingled with other property which cannot be subdivided without difficulty,

the United States shall be entitled to forfeiture of substitute property up to the value of the

forfeitable property pursuant to 21 U.S.C. § 853(p), as incorporated by 28 U.S.C. § 2461(c).

18 U.S.C. § 981(a)(1)(C)
28 U.S.C. § 2461(c)

*Erek L. Barron* /APL

Erek L. Barron
United States Attorney

A TRUE BILL:

**SIGNATURE REDACTED**

Foreperson

10|3|23

Date